**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

KELLI FERGUSON,
Plaintiff,

v.

FAIRFIELD CATERERS, INC., et al.,
Defendants.

No. 3:11-cv-01558 (JAM)

**RULING ON POST-TRIAL MOTIONS**

For many years, plaintiff Kelli Ferguson and her father worked for one of Connecticut's prominent wedding catering/event venue businesses. After plaintiff was fired from her job in 2010, she sued the business owners and several of their operating companies. She claimed in part that defendants had fired her in order to retaliate against her father for having lodged a claim of age discrimination against them. Following a two-week trial, the jury awarded plaintiff damages of nearly $300,000 on this retaliation claim (while rejecting her other claims).

Post-trial motions have proliferated. For reasons set forth below, I will deny defendants' motions for a judgment as a matter of law and for a new trial. I will grant in large part plaintiff's motion for attorney's fees and costs. And I will deny plaintiff's motion for prejudgment interest.

**BACKGROUND**

The facts set forth below are based on evidence introduced at trial and presented in the light most favorable to the jury's verdict in plaintiff's favor. Plaintiff and her father—Kevin Heslin—both worked for defendants for many years until early 2010. Defendants are John Royce and Thomas Montague, who owned each of four major operating companies—defendants Fairfield Caterers, Inc. (d/b/a The Fox Hill Inn), Waterview, LLC, The Candlewood Inn, LLC, and Riverview Catering, LLC. Royce was more active in the day-to-day affairs of the business than Montague, but they worked closely together and made major company decisions by

consensus.

Kevin Heslin spent his career managing wedding sales and promotion for defendant Fairfield Caterers. He was a successful salesperson throughout the decades that he worked there. He saw business expand and he was ultimately put in charge of sales for the company's largest wedding venue. Plaintiff began working for the business at the age of 15, checking coats part time. She rose up through the ranks over more than two decades as defendants' business expanded to opening and operating additional wedding banquet venues. By 2009, plaintiff was a general manager with supervisory responsibilities across all of defendants' venues, and she supervised her father among many other employees. She had a generally good working relationship with Royce and Montague.

But that relationship started to sour after Royce and Montague decided that it was time for plaintiff's father to retire from the business. Royce and Montague met in July 2009 with plaintiff and her sister Holly Heslin (who was also employed by the business) to tell them that they thought it was time for their father to retire. They allegedly told the sisters that brides who visited their father's venue could not relate well to him because he was too old.

Soon, Royce met with Kevin Heslin in person to tell him that he should retire; Heslin's employment was extended but eventually terminated in January 2010 on his 71st birthday. Later that month, Heslin filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO), alleging that he had been terminated based on his age in violation of federal and state law.

Royce and Montague were upset at Heslin's claim of age discrimination. According to plaintiff, Royce repeatedly and vehemently asked her to convince her father to withdraw his complaint, and he ominously warned that her refusal could carry consequences. But she declined

to persuade her father to drop his claim.

Soon enough, Royce hired a private investigator who began looking into Heslin's practices while he was managing sales for the company. Plaintiff testified that in late February or early March 2010, while she was sitting in her office, she overheard a meeting between Royce, Montague, and the private investigator. She heard them discussing their desire to fire her, and she heard the private investigator warn them that they could not take certain actions because doing so would violate the law.

At trial, Royce and Montague maintained that they were losing confidence in plaintiff's management style. There was disputed testimony about allegedly lax management by plaintiff and actions by plaintiff to protect her father from effective oversight.

Defendants' investigation soon disclosed that Heslin solicited and received numerous payments of $200 per event from many of the independent wedding vendors—such as DJs, florists, and bands—whom he in turn recommended to furnish services for weddings that took place at defendants' venues. Defendants characterized these payments at trial as secret kickbacks that were in violation of company policy and the law.

Further investigation showed that plaintiff had also frequently accepted such payments. Several years earlier, Heslin had been reprimanded for accepting similar vendor payments, and plaintiff was aware of this reprimand. Plaintiff, however, testified that she perceived the payments she received as tips, and that there was never a *quid pro quo* understanding between her and the vendors that they would not be recommended if they did not pay her.

Nevertheless, at the end of March 2010, after Royce and Montague confronted plaintiff about the vendor payments, they immediately terminated her employment. At that time, plaintiff was pregnant with her second child.

Plaintiff filed this lawsuit contending that she was fired as a form of pregnancy discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and that she was fired in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, for retaliatory reasons relating to the fact that her father had lodged a complaint of age discrimination. She also lodged parallel claims of discrimination and retaliation under the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60 *et seq*. Plaintiff's lawsuit was consolidated for trial with a similar lawsuit by her work colleague and husband, Keith Ferguson, who claimed that he had suffered adverse employment consequences as a result of his relationship with plaintiff and her father.

A two-week jury trial ensued during which the following witnesses testified:

- Kelli Ferguson, plaintiff (former general manager of The Waterview)
- Holly Heslin (Kelli Ferguson's sister and former salesperson for defendant companies)
- Steven Shapiro (expert witness economist)
- John Royce, defendant (owner of defendant companies)
- Joel Krantz (band leader)
- Filomena Tropeano (general manager of The Candlewood Inn)
- Keith Ferguson, plaintiff (Kelli Ferguson's husband and former operations manager of The Waterview)
- Nancy Durkin (former assistant manager at The Waterview)
- Thomas Montague, defendant (owner of defendant companies)
- Susan Ouellette (former sales director for The Riverview)
- Linda Franco (former event coordinator at The Waterview and The Fox Hill Inn)
- Susan Beaumont (former office manager at The Fox Hill Inn)

- Maureen Huntley (former sales director for The Riverview)
- Barbara LaValle (band leader)
- Simon Curtis (CFO, defendant companies)

Much of the trial involved plaintiff's evidence that defendants sought vengeance on her father by firing plaintiff. By contrast, defendants contended that plaintiff was fired for non-discriminatory reasons, primarily because of her undisclosed acceptance of vendor payments in violation of company policy. Plaintiff's evidence prevailed in large part. The jury found that defendants terminated plaintiff's employment in order to strike back at her father for pressing his claim of age discrimination. The jury otherwise rejected plaintiff's pregnancy discrimination claim as well as additional retaliation claims relating to plaintiff's father. The jury likewise rejected all of Keith Ferguson's claims.

The jury awarded plaintiff total back pay damages of $288,235.88, allocating the damages as follows: a single dollar against each of the four company defendants, and $144,115.94 each against both Royce and Montague individually. The jury declined to award emotional distress damages, front pay damages, or punitive damages.

Defendants have since filed a motion for judgment as a matter of law (Doc. #184) and a motion for a new trial (Doc. #185). Plaintiff has filed motions for attorney's fees and costs (Docs. #176, #199, #213) and a motion for prejudgment interest (Doc. #177).

## DISCUSSION

***Defendants' Motion for Judgment as a Matter of Law***

At the conclusion of the trial evidence, defendants moved under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law, and the Court denied that motion. Docs. #159, #175. Defendants have now renewed that motion and, in the alternative, moved for a

new trial. Docs. #184, #185.

Under Rule 50, a motion for judgment as a matter of law will only be granted where "a reasonable jury [did] not have a legally sufficient evidentiary basis to find for the party" that prevailed at trial. Fed. R. Civ. P. 50(a)(1).

> A Rule 50 motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]."

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)). The Court "'must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (quoting *Brady*, 531 F.3d at 133).

Royce and Montague contend that they were not properly held personally liable, because it was the corporate defendants—not them personally—who employed plaintiff and who terminated her employment.[1] I consider this claim in light of the following background principles of liability for a claim of unlawful retaliation in the employment context. To establish a claim of retaliation under either the ADEA or CFEPA, "a plaintiff must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* at 129 (internal quotation marks and citation omitted); *Timbie v. Eli*

[1] There was some dispute at trial about which of the corporate defendants were plaintiff's employer, and the jury was instructed concerning the legal basis for holding more than one company liable on grounds of their integrated management structure. It is not relevant to defendants' argument here which of the corporate defendants qualified as plaintiff's employer.

*Lilly & Co.*, 429 F. App'x 20, 22 n.1 (2d Cir. 2011) ("Claims of age discrimination under the CFEPA and the ADEA are subject to the same legal analysis.").

It is undisputed that Kevin Heslin's filing of an age discrimination complaint with the CHRO was "protected activity" that could not lawfully be subject to retaliation. *See* 29 U.S.C. § 623(d); Conn. Gen. Stat. § 46a-60(a)(4); *Bucalo*, 691 F.3d at 131. Moreover, plaintiff's retaliation claim was not precluded by the fact that it was her father—and not her—that engaged in protected activity. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173–78 (2011). To the contrary, a plaintiff victim may recover for retaliation in response to another person's protected activity if the relationship between the plaintiff victim and the other person was of the type where the action taken against the plaintiff "'might have dissuaded a reasonable worker [in the third person's position] from making or supporting a charge of discrimination.'" *Id.* at 174 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). If this were not the rule, then employers could easily penalize an employee's protected activity merely by striking back at friends or family members who happened as well to work for the employer.

Royce and Montague are mistaken in their contention that only the corporate defendant employers could be held liable for retaliation. Even assuming that ADEA liability may lie only against an employer, CFEPA allows for any person—not just a corporate employer—to be liable for acts of prohibited employment discrimination. *See* Conn. Gen. Stat. § 46a-60(a)(4) (prohibiting in part "any person" from acting "to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint"); *see also Ahmad v. Yellow Cab Co. of New London & Groton, Inc.*, 49 F. Supp. 3d 178 (D. Conn. 2014) (citing cases holding that "supervisory employees or other employees may be held individually liable under" Conn. Gen. Stat. § 46a-

60(a)(4)); *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 203 (D. Conn. 2000) (same); *Perodeau v. City of Hartford*, 259 Conn. 729, 737–38, 792 A.2d 752 (2002) (noting that the legislature clearly intended CFEPA's anti-retaliation provision "to apply to persons other than employers").[2]

Defendants seize upon language in CFEPA that prohibits the act of "discharge," *see* Conn. Gen. Stat. § 46a-60(a)(4), and they contend that only the corporate employer defendants had authority to discharge plaintiff from her employment. But this argument overlooks additional language of the same statute that allows for liability against "any person" who "otherwise discriminate[s]" against someone engaged in protected activity. In addition, a non-employer individual may equally be liable under CFEPA for aiding and abetting an employer's act of retaliatory discharge. *See id.* § 46a-60(a)(5) (prohibiting "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice").[3] Here, the evidence was abundantly clear that it was Royce and Montague who made the decision to terminate plaintiff's employment, and there is no merit to their claim that they are somehow shielded from liability by the presence of the corporate defendant employers in this case. In short, both defendants Royce and Montague were properly subject to liability for retaliatory termination under CFEPA.

---

[2] Defendants also object that the Court instructed the jury on the "motivating factor" causation standard, arguing that only the "but for" causation standard should apply. Doc. #184-1 at 9–10. This objection is puzzling, because the jury returned a verdict concluding that unlawful retaliation against Kevin Heslin was *both* a "motivating factor" *and* the "but-for" cause of the adverse employment action against plaintiff. Doc. #166 at 2. Moreover, to the extent that defendants further contend that the jury should have been required to conclude that retaliation was the "sole and exclusive motive on the part of Royce and Montague," Doc. #184-1 at 10, this is a misstatement of even the more demanding "but for" causational standard that applies under federal law. *See, e.g.*, *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (noting that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive").

[3] Although the jury was not specifically instructed on aiding-and-abetting liability under § 46a-60(a)(5) for the retaliatory discharge claim, it is clear that the evidence was sufficient to establish this ground for liability, such that any possible error under § 46a-60(a)(4) was harmless.

Defendants otherwise argue that "no reasonable juror could possibly find . . . that Kelli Ferguson's poor managerial skills and undisputed receipt of a substantial amount of vendor payments dating back to the 1990's was not the determinative factor" in the decision to terminate her employment. Doc. #184-1 at 11. But I will not second-guess the jury's evaluation of the evidence as defendants would like me to do. There was ample trial evidence for a reasonable jury to conclude that plaintiff was a very successful employee who was terminated within several weeks of her father's age-discrimination complaint and in the aftermath of evidence indicating that Royce and Montague were upset because of her father's filing of a discrimination claim.

Both Montague and Royce testified to their frustration and anger when they received Kevin Heslin's age discrimination complaint, indicating that they believed the complaint to be baseless and fabricated. Plaintiff and her sister testified that Royce dogged them both to ask Kevin to drop the complaint. Moreover, plaintiff testified that Royce specifically threatened her by stating that if her father did not drop his complaint, "there would be consequences on you."[4] What is more, Joel Krantz—one of the preferred vendors who Royce contacted about vendor payments—testified that Royce told him that Kevin Heslin's actions were jeopardizing his daughter's employment, and that Royce had the power to "drop the A-bomb," which Krantz took to mean that Royce might terminate plaintiff's employment.

Not to the contrary is the fact that plaintiff received secret vendor payments. To be sure, a jury could reasonably have concluded that the fact of her receipt of these payments independently justified her termination, regardless of any motive to terminate her as retaliation for her father's age discrimination complaint. But that was not the only reasonable conclusion

[4] Although there was contradictory evidence as to whether Royce specified that the stated consequences would fall "on [Kelli Ferguson]," as opposed to noting that consequences would result generally, I must defer to the jury's credibility determinations, and a reasonable jury could have found plaintiff's testimony to be credible.

that could be drawn from the evidence. To begin with, no written employment policy at the time unambiguously prohibited employees from receiving such payments. Moreover, a reasonable jury could well have concluded that the vendor payments were *not* really the grounds for plaintiff's termination and that Royce and Montague had zealously sought evidence about these payments in search of a pretext to terminate plaintiff's employment. It is undisputed that Royce and Montague hired a private investigator, ostensibly to look into the collection of vendor payments. Krantz testified that Royce pressured him to divulge information about whether he had given kickbacks to Kevin Heslin over the years, threatening to limit Krantz's business if he refused to provide information. Barbara Lavalle, another vendor, testified that Royce also called her to solicit information about whether plaintiff had accepted payments. Shortly after Krantz declined to help Royce, plaintiff was fired. And plaintiff testified that she overheard the investigator advise Royce and Montague repeatedly that their intended actions were illegal.

In addition, Royce and Montague's response to the news that plaintiff had accepted such payments was dramatically different from their response when they learned that another business manager—Filomena Tropeano—had accepted payments. Royce confronted plaintiff and terminated her, but he gave Tropeano no more than a warning. Although Royce offered reasons for treating Tropeano differently, a reasonable jury could have concluded that this explanation was not credible and that plaintiff was singled out for retaliatory reasons. In short, a reasonable jury could have concluded that defendants terminated plaintiff's employment to retaliate against her father for his filing of an age discrimination claim.

***Defendants' Motion for a New Trial***

Defendants have also moved for a new trial "on limited issues" (Doc. #185). Rule 59(a) of the Federal Rules of Civil Procedure provides that the Court may grant a new trial "for any

reason for which a new trial has heretofore been granted in an action at law in federal court." The standard for granting a motion for a new trial is lower than the standard for granting a Rule 50 motion—a judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted). Still, a motion for a new trial "'is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.'" *Applera Corp. v. MJ Research Inc.*, 389 F. Supp. 2d 344, 347 (D. Conn. 2005) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)) (internal quotation marks omitted). I may only grant a motion for new trial "if the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014) (internal quotation marks and citations omitted).

Defendants seek a new trial on three grounds. First, they contend that, because the jury may have misunderstood the jury instructions, a new trial should be granted or that "the compensatory damages awarded against Royce and Montague . . . should be reduced to $1 each so that they are the same as the nominal damages of $1 awarded against each of the corporate defendants who were Kelli Ferguson's *actual employer*." Doc. #185-1 at 6; *see also id.* at 3–12. According to defendants, "the Jury may have gotten confused" and decided to award damages against the individual defendants without respect to the explicit limitations set forth in the damages instruction providing that back pay should not be awarded if plaintiff would have been terminated anyway for lawful reasons. *Id.* at 8–11. I decline to speculate that the jury may have been confused, and defendants have not shown that the instructions in this respect were misleading or wrong.

To the contrary, the jury instructions made clear the potential limitation on back pay (Doc. #167 at 18) and without suggestion that this limitation should apply only to the corporate defendants. It is evident that the jury concluded that this limitation should not apply at all in this case (in view that it awarded compensatory damages against all six defendants in varying amounts), and the jury's verdict is clear that the jury wished to assess the bulk of damages against the individual defendants personally rather than against the companies that they owned. This was no injustice and quite understandable in view of the evidence that Royce and Montague completely controlled each of the corporate defendants. Moreover, even assuming there were a legal basis to do so, defendants never asked for an instruction limiting the liability of the individual defendants to no more than the liability of the corporate defendants.

Defendants' second argument for a new trial is that the jury's verdict was "seriously erroneous" and "against the substantial weight of evidence." Doc. #185-1 at 12–24. Here, defendants rehash the same arguments that were found wanting by the trial jury. I conclude for reasons discussed above that there were ample grounds for a reasonable jury to conclude as it did that defendants fired plaintiff for a retaliatory reason.

Lastly, defendants complain that the Court erred in the admission of evidence. Doc. #185-1 at 24–30. I reject these claims for the same reasons that I rejected them to the extent that they were raised at trial. I first note that even if I found such an error—which I do not—"an erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'" *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012). No such error was committed here.

Defendants' claim that the Court erred by admitting evidence of settlement negotiations is also not persuasive. Rule 408 operates to bar evidence of settlement negotiations "to support a

finding on the merits of the [same] dispute" at issue in the case at hand. Fed. R. Evid. 408; *Rein v. Socialist People's Libyan Arab Jamahiriya*, 568 F.3d 345, 352 (2d Cir. 2009). Although the jury heard testimony referencing defendants' involvement in settling Kevin Heslin's age discrimination claim, the merits of that claim were not before the jury in this case. Moreover, this evidence was not admitted to prove defendants' liability for the retaliation claims at issue. Rule 408 does not apply under these circumstances.

But even if it did, the settlement evidence would be admissible under the Rule's exception allowing settlement evidence to be admitted "for another purpose," including to "prov[e] bias or prejudice of a witness." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 114 (2d Cir. 2008) (quoting Fed. R. Evid. 408(b)) (internal quotation marks omitted). This "exception clearly intends to exempt from the absolute prohibition of the Rule evidence focused on issues different from the elements of the primary claim in dispute." *Ibid.* The evidence at issue was offered to prove that defendants were motivated to take action against Kelli Ferguson in order to gain leverage in their negotiations with Kevin Heslin—not to demonstrate that they accepted responsibility for Kevin Heslin's age discrimination claims.

There is no indication that this settlement evidence caused "spillover" prejudice to infect the jurors' perception of defendants' conduct towards Kelli Ferguson to the extent that such prejudice "substantially outweighed" the probative value of the evidence and would require retrial. Fed. R. Evid. 403. Defendants' attempts at settlement predated Kelli Ferguson's termination. *See PRL USA Holdings, Inc.*, 520 F.3d at 116 (evidence of trademark settlement agreement that predated the trademarks in dispute was not unfairly prejudicial in trademark infringement case). Moreover, the jury found in defendants' favor on plaintiff's pregnancy discrimination and direct retaliation claims, indicating that any resulting prejudice was not all-

encompassing or outcome determinative. *See ibid.*

Defendants claim that the Court should have excluded as irrelevant or overly prejudicial any evidence that defendants hired counsel and a private investigator to defend themselves against Kevin Heslin's discrimination claims, that defendants filed a complaint against Kevin Heslin with the Brookfield Police Department, and that they later asked the Brookfield police to cease the criminal investigation. They also challenge the admissibility of the decision from the Connecticut Department of Labor appeals board finding that Kevin Heslin was entitled to receive unemployment benefits (Pl.'s Exh. 74). Finally, they dispute the admissibility of an audio recording from Kevin Heslin's unemployment hearing, in which Simon Curtis—who was present to represent the companies' interests—stated that the company had to "respond" to Kevin Heslin's discrimination complaint, and predicted that the results would be "unpleasant" and "hurtful," and likely to destroy relationships (Pl.'s Exh. 93).

But this evidence was plainly relevant to plaintiff's third-party retaliation claim, as it highlights the course of defendants' dealings with respect to Kevin Heslin leading up to and following the decision to terminate plaintiff's employment. Plaintiff claimed that defendants retaliated against Kevin Heslin by terminating her, and a jury could reasonably infer that this evidence highlighted defendants' intent to retaliate against Kevin Heslin, or illustrated their actual attempts to retaliate against him through other means.[5]

Moreover, none of this evidence—hiring counsel, filing a police report, and testifying at an unemployment benefits hearing—is so inherently inflammatory that any potential prejudice might "substantially outweigh[ ]" its probative value. Fed. R. Evid. 403. Any inference that

[5] Indeed, defense counsel conceded at the pretrial motions hearing on July 9, 2014, that the audio recording (Pl.'s Exh. 93) constituted an admission by Simon Curtis that was relevant to plaintiff's retaliation claim.

jurors might have drawn was permissible and far from unfairly prejudicial. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 150 (2d Cir. 2010) ("'Unfair prejudice' is that which might dispose a jury to render a verdict for reasons unrelated to the merits of the case." (citation omitted)). *Cf. Lore*, 670 F.3d at 173–74 (excluding testimony about defendant's other retaliatory acts under Rule 403 because it involved "an entirely different incident involving . . . different people, places and events." (internal quotation marks and citation omitted)). In addition, the Court issued requested limiting instructions that the jury not infer anything nefarious simply from defendants' lawful decision to hire counsel and that the jury not consider any advice-of-counsel claim or defense. *See Vichare v. AMBAC Inc.*, 106 F.3d 457, 467 (2d Cir. 1996).

In short, I will deny defendants' motion for a new trial. The jury did not improperly or irrationally apply its instructions when it assessed most of the damages against Royce and Montague rather than the corporate defendants. The evidence easily sufficed for a reasonable jury to conclude that plaintiff was terminated for a retaliatory reason stemming from her father's filing of an age-discrimination claim. And there was no erroneous admission of evidence at trial, much less an erroneous admission of evidence so prejudicial as to warrant a new trial.

***Plaintiff's Motions for Attorney's Fees and Costs***

As a prevailing party for the ADEA and CFEPA age discrimination claims, plaintiff is entitled to an award of reasonable attorney's fees. *See* 29 U.S.C. § 626(b) (incorporating remedies provided in 29 U.S.C. § 216(b)); Conn. Gen. Stat. § 46a-104. The Court must determine a presumptively reasonable fee, based on a reasonable hourly rate and the number of reasonably expended hours. *See, e.g.*, *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 289–90 (2d Cir. 2011). To determine the reasonable number of hours and whether the requested compensable hours should be subject to reduction, the Court also considers "the degree

of success obtained by the plaintiff," *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (internal quotations marks and citation omitted), as well as the following factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989); *see also McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 415 (2d Cir. 2010) (affirming same factors in "statutory fee-shifting context[ ]").

Defendants do not challenge plaintiff's counsel's stated billing rate of $300 per hour, and I find this rate to be reasonable. I decline, however, to fully credit the amount of hours that plaintiff's counsel has claimed. To begin with, plaintiff prevailed on a single claim of retaliation, but the jury ruled against her on her additional, related theories of retaliation as well as on her claim of Title VII pregnancy discrimination. *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012) (noting court's authority to reduce award to the extent requested time was "not reasonably necessary to the outcome of the litigation"). Plaintiff's claim of pregnancy discrimination bordered on the frivolous and needlessly consumed substantial testimony and time at trial. Similarly, plaintiff's counsel co-represented co-plaintiff Keith Ferguson whose claims were all rejected by the jury and quite understandably so in light of what I saw at trial. Despite counsel's claim that they have carefully culled out fees that were specific to just Keith Ferguson, I am concerned for reasons stated in defendants' opposition that some noncompensable billings inevitably remain. In my view, a substantial reduction of plaintiff's fee

request is appropriate.

As I am not required to conduct a line-by-line review of plaintiff's extensive fee application, I instead choose to exercise my discretion to use a percentage deduction as a practical means to reducing excess. *See Marion S. Mishkin Law Office v. Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014). I am also mindful of defense counsel's representation at the hearing of November 21, 2014, that defendants would consider a reduction of "fifty percent, plus or minus twenty percent" of the amount requested by plaintiff's counsel to be fair.

Accordingly, I reduce plaintiff's requested fee and cost award amount by 30% to account for the overlap in time spent on plaintiff's single winning claim and the other losing claims. *See, e.g., U.S. Football League*, 887 F.2d at 415 (finding that a 30% reduction over claimed amount was appropriate for limited success and "vagueness in the documentation of certain time entries"); *Negron v. Mallon Chevrolet, Inc.*, 2012 WL 4358634, at *5 (D. Conn. 2012) (reducing fee request by 30% for limited success in claims); *Milde v. Hous. Auth. of Town of Greenwich*, 2006 WL 6908276, at *13 (D. Conn. 2006) (reducing fees by 30% based on fact that some claims were "wholly unsuccessful"). Subject to this reduction, I will grant plaintiff's motions for prejudgment attorney's fees (Docs. #176, #199) and award $209,800.50 for prejudgment fees.

In addition, I find the time spent by plaintiff's counsel on post-judgment litigation to be compensable, *see Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999), but excessive as claimed. Plaintiff's counsel indicates that the time spent on post-verdict litigation over the course of about three months equates to nearly 20% of the time spent litigating the case between the time she filed her CHRO complaint and she received a favorable jury verdict. *Compare* Docs. #176-1 at 3 ¶ 6, #176-5 at 4, ¶ 20, *with* Doc. #213 at 4, ¶¶ 10, 11. This seems disproportionate. Accordingly, I will grant plaintiff's supplemental motion (Doc. #213) but reduce the requested amount by

30%, awarding $39,198.60 in attorney's fees for post-judgment litigation. *See, e.g.*, *Salazar v. Dist. of Columbia*, 991 F. Supp. 2d 39, 58 (D.D.C. 2014) (reducing attorney's fees for post-judgment motion to bring fees in proportion with time spent on and fees obtained for litigating earlier motions).

Plaintiff also seeks an award for costs. *See* Fed. R. Civ. P. 54(d); *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 101 (2d Cir. 2006) (*per curiam*) ("[A] litigant who is a prevailing party for purposes of attorney's fees is also the prevailing party for purposes of costs."). Here, while each of the losing claims brought by plaintiff's counsel had facts in common with their successful claims, there is no basis for an award of costs to the extent they were incurred to advance Keith Ferguson's claims. For example, counsel's work investigating the circumstances subsequent to Kelli Ferguson's termination related primarily to Keith Ferguson's claims and were almost entirely unrelated to Kelli Ferguson's third-party retaliation claim. For this reason, I similarly reduce plaintiff's request for costs by 30%. Accordingly, plaintiff's counsel is entitled to recover $11,636.83 for costs in this litigation. All in all, I will award $209,800.50 for prejudgment attorney's fees, $39,198.60 for post-judgment attorney's fees, and $11,636.83 for costs associated with this litigation.

***Plaintiff's Motion for Prejudgment Interest***

Plaintiff has moved under Conn. Gen. Stat. § 37-3a(a) for an award of 10% prejudgment interest with respect to her back pay award and in consideration of the approximately four years that elapsed between her termination and trial. It is true that the Connecticut prejudgment interest statute permits the award of prejudgment interest as "damages for the detention of money after it becomes payable." *Ibid.* As the Connecticut Supreme Court has explained, "[p]rejudgment interest awarded pursuant to § 37-3a is in the nature of compensatory damages." *Chapman*

*Lumber, Inc. v. Tager*, 288 Conn. 69, 102 n.36, 952 A.2d 1 (2008).

The problem here, however, is that plaintiff did not seek prejudgment interest as a part of her compensatory damages award at trial. Ample authority concludes that such damages are for the jury to determine at trial rather than for a judge to decide after the fact by means of post-trial motions. *See, e.g.*, *Retepromaca Representaciones Tecnicas Proyectos y Sistemas, C.A. v. Ensign-Bickford Co.*, 2004 WL 722231, at *8–9 (D. Conn. 2004); *Neptune Grp. Inc. v. MKT, Inc.*, 205 F.R.D. 81, 88 (D. Conn. 2002) (Droney, J.).[6] Indeed, as Judge Kravitz noted, "whether a defendant has detained money after it became payable is a factual issue, not a legal issue," and "the finder of fact must determine whether the defendant wrongfully detained money damages due to the plaintiff before the plaintiff can seek an award of prejudgment interest under Connecticut General Statutes § 37-3a(a)." *Daimlerchrysler Ins. Co., LLC v. Pambianchi*, 2011 WL 721630, at *1 (D. Conn. 2011), *aff'd on other grounds*, 469 Fed. App'x 65 (2d Cir. 2012). Not to the contrary are any decisions in which a court has allowed for the post-jury-trial award of prejudgment interest but has done so absent an objection that the issue of wrongfulness should have been submitted to a jury in the first instance. *See, e.g.*, *Goetz v. Hershman*, 423 Fed. App'x 3, 5 (2d Cir. 2011).

Moreover, although plaintiff claims that federal law differs from the state law rule set forth under Conn. Gen. Stat. § 37-3a(a), plaintiff does nothing to show why the state prejudgment interest statute would not govern any award with respect to the state law CFEPA claim that was the sole basis for recovery against Royce and Montague—all but $4 of the jury's total award of $288,235.88. I need not decide if a different rule applies for federal law damages

[6] Plaintiff seeks to distinguish *Retepromaca* and *Neptune Group* on grounds that they did not involve CFEPA claims, but the relevant issue is that they involved the same prejudgment interest statute—Conn. Gen. Stat. § 37-3a—that plaintiff here claims as her basis for an award of pre-judgment interest.

awards. In light of *de minimis non curat lex,* I do not construe plaintiff's motion to seek prejudgment interest for the paltry $4 of jury award against the corporate defendants that could be said to be based in part on the federal ADEA statute.

In any event, even if it were proper for me to determine an award of pre-judgment interest, I would decline to exercise my discretion to do so. *See, e.g.*, *Salce v. Wolczek,* 314 Conn. 675, 696, 104 A.3d 694 (2014) (noting discretion under Conn. Gen. Stat. § 37-3a(a) whether to award pre-judgment interest). Although one cannot say how the jury calculated its award of back pay, I trust that the jury considered how to compensate plaintiff to the extent that it thought proper. I cannot be certain that the jury did not discuss or contemplate some measure of the time-value of money. In my discretion and in light of plaintiff's failure to request a jury determination of this issue, I decline to add potentially duplicatively to plaintiff's total award or to add to the award in a manner that the jury may have declined in the first instance to do.

**CONCLUSION**

For the reasons stated above, defendants' motions for judgment as a matter of law and for a new trial (Docs. #184, #185) are DENIED. Plaintiff's motions for attorney's fees and costs (Docs. #176, #199, #213) are GRANTED in large part, and defendants shall pay $209,800.50 for prejudgment attorney's fees, $39,198.60 for post-judgment attorney's fees, and $11,636.83 for costs associated with this litigation. Plaintiff's motion for prejudgment interest (Doc. #177) is DENIED.

It is so ordered.

Dated at Bridgeport this 20th day of May 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge